JAMES M. MORSE

*v.*

BALTHEUS F. SEIBOLD *et al.*

*Filed at Ottawa October 26, 1893.*

1. LIMITATION—*when possession becomes adverse.* Possession of land taken under a deed made by the holder of a certificate of purchase under sheriff's sale, before the time of redemption expired, which deed provided that in case the land should be redeemed from the sheriff's sale the grantor would refund the purchase money to the grantee, would not become adverse from the date of the deed, but only from the time the right of redemption expired.

2. Adverse possession of land sufficient to defeat the legal title under the twenty years' limitation law must be hostile in its inception and its character, and must so continue uninterruptedly for twenty years. It must be under a claim as against the world. So long as the possession is consistent with or in submission to the title of the real owner it is not adverse.

3. LACHES—*as against bill for specific performance.* On January 2, 1883, A sold to B a tract of land, a part of the price paid down, the balance to be paid in certain installments, when a warranty deed was to be made. A's title being defective, he, in June, 1883, and again in January, 1886, tendered to B a special warranty deed and demanded payment of the balance of the price, which the latter refused. A then offered to return the purchase money received and to rescind the contract. B neither offered to rescind nor made any tender of the unpaid purchase money, but on November 4, 1889, filed his bill for the specific performance of the contract: *Held,* that B's *laches* was such as to defeat the relief sought.

4. SAME—*defined. Laches* has been defined to be such neglect or omission to assert a right, as, taken in conjunction with lapse of time more or less great, and other circumstances causing prejudice to the opposite party, operates as a bar in a court of equity.

5. SPECIFIC PERFORMANCE—*when refused.* As a general rule, the specific performance of a contract will not be decreed, when, from a view of all the circumstances of the case, it appears that such performance will produce hardship or injustice to either of the parties. And when the property greatly enhances in value while the purchaser delays his determination as to taking the vendor's title, a court of equity will regard it as unjust to compel the vendor to perform.

6. Same—*readiness of complainant to perform.* A party seeking the specific performance of a contract is bound to show that he has been ready, willing and eager to perform on his part. Such relief is not a matter of absolute right, and a bill seeking such relief is addressed to the sound legal discretion of the court.

7. Vendor and purchaser—*defective title—rights of purchaser.* The purchaser of land who contracts for a warranty deed is not obliged to pay his money and receive a defective title, but he has the right to elect to take the defective title with such covenants as the vendor has agreed to make.

8. Where the vendor is unable to convey a good title at the proper time, the vendee, within a reasonable time, should either treat the contract as inoperative and demand the return of his cash payment, or tender the balance of the purchase money and demand a full warranty deed.

Appeal from the Circuit Court of Peoria county; the Hon. T. M. Shaw, Judge, presiding.

This is a bill filed in the Circuit Court of Peoria County on November 2, 1889, by appellant against appellees and one Clinton for the specific performance of a contract, by which appellee, Baltheus F. Seibold, agreed to sell to appellant, Morse, six acres of land. The defendants answered the bill, denying the material allegations and charging *laches* on the part of the complainant. Clinton filed a cross-bill. The Circuit Court by its decree dismissed both the cross-bill and the original bill for want of equity. The present appeal is prosecuted from said decree.

The contract is as follows:

"Peoria, Ill., *Jan. 2, 1883.*

"Received of James M. Morse $25, in consideration of which we agree to sell to said James M. Morse, or his legal assignee, the following lands * * * for the sum of $1500, payable as follows: $25 cash, the receipt of which is hereby acknowledged, $275 payable on or before January 15, 1883, and, upon said payment of $275 cash on said date, warranty deed to be made to said Morse on his executing a mortgage on said land

·to secure the balance of the purchase money, to be represented by four notes, of $300 each, due on or before one, two, three and four years, with interest at six per cent per annum, interest payable annually.          FRIEDERICKE SEIBOLD."

It is conceded that Baltheus F. Seibold and the signer of the above contract were one and the same person, and that ·the word, "we," refers to him and his wife.    After the making ·of this contract Morse discovered that there was a defect in the title.    In 1866 Charles D. Clinton, being the owner of the premises, mortgaged the same to William Harsch, who fore- ·closed his mortgage by *scire facias*, and obtained judgment in 1867.    At a sale under the judgment Harsch purchased· the property on December 18, 1867, and on that day a certificate ·of purchase was issued to him by the sheriff, and he went into possession of the premises.    On April 2, 1868, Harsch sold ·the property and delivered the possession thereof to the ap- pellee, Baltheus F., or Frederick, Seibold, executing to him :a quit-claim deed of that date which contained ·the following provision :   "And said party of the first part does by these presents absolutely release and quit-claim unto the said party ·of the second part any and all right, title, claim and interest ·that he may now have    *    *    *    by a deed which he got from the sheriff of Peoria County, but if the above land shall be redeemed from said sheriff's sale, then the party of the first part will refund the above money to the party of the second part."    Said quit-claim deed was recorded on the day of its ·date.    Said· certificate of purchase was also recorded within the time required by law.    No deed was ever issued by the ·sheriff in pursuance of said certificate, either to Harsch, or to his grantee, B. F. Seibold.    In view of this fact, the following :agreement, dated March 17, 1883, was executed by B. F. Sei- bold and delivered to Morse :

"Whereas, on the 2d day of January, 1883, J. M. Morse ;purchased of the undersigned, B. Frederick Seibold, six acres

of land, which he purchased of William Harsch on or about 1868, and described * * * and whereas, it appears that one Charles D. Clinton appears to have some equitable interest therein, and the same not having been quit-claimed or conveyed to me, now I hereby agree, in consideration of the former agreement and other considerations, to extend the time of the payment of the $275 which was to have been paid on or about January 15, 1883, until May 1, 1883, so I can have the title cleared so I can convey to said Morse, by good and sufficient deed or deeds of conveyance, said property, it being agreed, that said Morse shall pay interest on the purchase money from January 2, 1883, at six per cent, and he shall be allowed credit for all the rent I shall receive from said land."

Both of the foregoing contracts were recorded shortly after their respective dates. After the execution of the contract of March 17, 1883, both Morse and Seibold made efforts to obtain a quit-claim deed from Clinton, but failed. About June 12, 1883, Seibold tendered to appellant a special warranty deed of the property, dated May 1, 1883, but appellant refused to accept it.

On November 23, 1883, Clinton commenced an action of ejectment against the tenant in possession, and Seibold was made defendant and defended the suit, which was finally dismissed on December 21, 1885, for want of prosecution. In January or February, 1886, B. F. Seibold, through his attorney, again tendered a special warranty deed to Morse, but the latter again refused to accept it. On January 4, 1887, B. F. Seibold executed a deed of the property to his son, the appellee William Seibold, who gave back to his father a mortgage to secure $1500 payable in 1, 2, 3, 4 and 5 years at four per cent interest per annum, which deed and mortgage were duly recorded, and are alleged in the bill to be without consideration and fraudulent and void as to the complainant.

It is conceded, that Seibold had acquired good title by possession for twenty years before the filing of the original bill

21—147 ILL.

herein; and it was because of the bar thus made complete that Clinton's cross-bill was dismissed.

Messrs. Jack & Tichenor, for the appellant.

Mr. William Don Maus, and Mr. J. M. Tennery, for the appellees.

Mr. Justice Magruder delivered the opinion of the Court:

The material question in this case, and the only one which we deem it necessary to consider, is the question of *laches.* Has the appellant been guilty of such delay in filing his bill as to make it inequitable to grant him a specific performance of the contract?

It is claimed by appellees, that B. F. Seibold acquired title by an adverse possession of twenty years on April 2, 1888, as he had been in possession of the premises ever since April 2, 1868, the date of his deed from Harsch; and that appellant was guilty of *laches,* because he waited nineteen months after the expiration of the twenty years on April 2, 1888, to-wit: until November 2, 1889, before he filed his bill. On the other hand, appellant contends that the period of limitation did not commence to run on April 2, 1868, the date of Seibold's entry into possession, but that it began to run on March 18, 1869, the date when the time of redemption from the sale made by the sheriff to Harsch on December 18, 1867, expired; and that there was no *laches,* because only seven months and a half elapsed after March 18, 1889, the date assigned for the completion of the bar of twenty years, before the filing of the bill on November 2, 1889. The basis of this contention is found in the language of the deed from Harsch to B. F. Seibold, which provided that, if the land should be redeemeed from the sheriff's sale, then Harsch would refund the money to Seibold. The interest quit-claimed is that which Harsch obtained "by a *deed* which he got from the sheriff of Peoria

County." But the word, "deed," was evidently used by mistake for "certificate," as the land could not have been redeemed from the sale, if the sheriff had already made a deed. As matter of fact, Harsch had only the equitable title when he conveyed to Seibold. He held nothing but a sheriff's certificate of sale, dated December 18, 1867, and, when he made his deed to Seibold on April 2, 1868, only three months and a half of the statutory period of redemption had expired. At that time the proceedings in the foreclosure suit brought by Harsch against Clinton were on file in the proper court in Peoria County, and the certificate of sale was on record in the recorder's office, so that Seibold must have understood what was referred to by the language of the deed. At any rate, he went into possession of the land under a deed which expressly recognized the right of Clinton to redeem from the sheriff's sale. We are inclined to think, that his possession did not begin to be adverse until March 18, 1869, when the time for redemption expired.

Adverse possession, sufficient to defeat the legal title, must be hostile in its inception and in its character, and must so continue uninterruptedly for twenty years. (*Turney* v. *Chamberlain,* 15 Ill. 271; *Bolden* v. *Sherman,* 101 id. 483.) There must be an assertion of ownership, which is hostile to all others, and which shall continue during the whole period of twenty years. (*Kerr* v. *Hitt,* 75 Ill. 51; *McNamara* v. *Seaton,* 82 id. 498). To constitute an adverse possession, it is not only necessary that there should be an actual, visible and exclusive possession, but that possession must be commenced and continued under a claim of right to hold the land against him who was seized. The occupation must be with the intention of claiming the fee against the true owner. (Angell on Lim.—6 ed.—sec. 390). Not only must there be an intent to exclude the rightful owner, but also to exclude all other persons. So long as the possession is consistent with, or in submission to the title of the real owner, it is not adverse within

the meaning of the law. (*Transportation Co.* v. *Gill*, 111 Ill. 541). "If A is in possession of a field of B's, he is in adverse possession of it, unless there is something to show that his possession is consistent with a recognition of B's title." (1 Am. & Eng. Enc. of Law, 225, and cases cited in notes). When Seibold went into possession on April 2, 1868, under the deed from Harsch, his possession did not become hostile to Clinton, the true owner, and to Clinton's judgment creditors until March 18, 1869. Until the latter date the possession was in subordination to the right of the true owner, or his creditors, to come in and redeem and terminate the possession. Inasmuch, therefore, as the bar of the statute did not become complete by the lapse of twenty years until March 18, 1889, and inasmuch as the bill was filed on the second day of November thereafter, we do not think that there was any *laches*, if the appellant had a right to keep the contract alive until March 18, 1889, and to wait, before filing his bill for specific performance, until Seibold had acquired title by an adverse possession of twenty years.

In June, 1883, and, again, in January or February, 1886, Seibold tendered to the defendant a special warrantee deed and demanded the payment of the balance of the purchase money. The defendant refused to accept the deed or to pay the money. There is no doubt that there was a serious defect at this time in the title of Seibold. No sheriff's deed had ever been issued upon the certificate of sale, and the time had long since passed within which the sheriff had any power to make the deed. The certificate was void under the statute. (*Peterson* v. *Emmerson*, 135 Ill. 55).

Appellant swears that, notwithstanding this defect in the title, he was willing to pay the balance of the purchase money, if a general warrantee deed had been tendered to him. He was not obliged to pay his money and receive a defective title. (*Wallace* v. *McLaughlin*, 57 Ill. 53). But he had the right to elect to take the defective title with such covenants as the

vendor had agreed to make. (*Harding* v. *Parshall*, 56 Ill. 219). Within a reasonable time, therefore, he should either have treated the contract as inoperative and demanded the return of the cash payment, or he should have tendered the balance of his purchase money and demanded a full warranty deed. (*Crabtree* v. *Levings*, 53 Ill. 526; *Lancaster* v. *Roberts*, 144 id. 213). He did neither, but waited three years and nine or ten months before filing the present bill, although Seibold indicated his intention to treat the contract as no longer binding by offering to return the cash payment. It cannot be denied that Seibold made reasonable efforts to perfect his title. He endeavored to obtain a quitclaim deed from Clinton, and employed attorneys to defend the ejectment suit brought by Clinton, and continued the defense of it until it was finally dismissed.

We think that, under the circumstances of this case, appellant was guilty of *laches* in waiting so long before filing his bill. *Laches* has been defined to be such neglect or omission to assert a right as, taken in conjunction with lapse of time more or less great, and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity. (12 Am. & Eng. Enc. of Law, page 533). As a general rule the specific performance of a contract will not be decreed when, from a view of all the circumstances of the case, it appears that such performance will produce hardship or injustice to either of the parties. (Warvelle on Vendors, page 741).

It appears from the evidence in this case that between January, 1883, and March, 1889, the property in dispute doubled in value. Where the property greatly increases in value while the purchaser delays his determination as to taking the vendor's title, a court of equity will regard it as unjust to compel the vendor to perform the contract. Indeed, it has been said that the delay of the purchaser in deciding whether he will accept the title or not, is an injustice, because he can enforce the contract against the vendor whether the title be

good or bad, whereas the vendor can only do so in case of a good title. (*Hoyt* v. *Tuxbury*, 70 Ill. 331).

A party seeking the specific performance of a contract is bound to show that he has been ready, willing and eager to perform on his part. (*Hoyt* v. *Tuxbury, supra*). It seems to us that the appellant in this case has not shown the proper readiness and willingness to perform. It cannot be that, where the vendor's title proves defective, the vendee can keep the contract open until sufficient time elapses to make the title good by prescription. If, after the vendor's possession has continued for sixteen years, the vendee can wait four years for the completion of the bar by the lapse of the twenty years, then when the possession has continued for four years only, the vendee can wait sixteen years before filing his bill, until the vendor's title has been perfected by an adverse possession of twenty years.

The specific performance of a contract in equity is not a matter of absolute right, but is addressed to the sound legal discretion of the Court. (1 Story's Eq. Jur. sec. 742; *Dintleman* v. *Gilbert,* 140 Ill. 597).

In the decree below some of the findings made by the court are not in harmony with the views herein expressed; but inasmuch as we think that the Circuit Court reached a correct conclusion in dismissing both the original and cross bills for want of equity, we conceive that it can make no difference what particular reasons led that court to the conclusion so reached by it.

The decree of the Circuit Court is affirmed.

*Decree affirmed.*